IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WENDY S. ECKLES,                )
                                )
    Plaintiff,                  )
                                )
    v.                          )   Civil Action No. 09-738
                                )   Electronic Filing
MICHAEL J. ASTRUE,              )
COMMISSIONER OF SOCIAL          )
SECURITY,                       )
                                )
    Defendant.                  )

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Plaintiff Wendy S. Eckles ("Eckles") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. For the reasons that follow, the motion for summary judgment filed by the Commissioner (*Document No. 11*) will be denied, and the motion for summary judgment filed by Eckles (*Document No. 9*) will be granted. The decision of the Commissioner will be reversed pursuant to the fourth sentence of § 405(g), and the case will be remanded with direction to grant benefits consistent with an onset date of August 27, 2007. [1]

**II.   PROCEDURAL HISTORY**

Eckles applied for DIB and SSI benefits on August 23, 2007, alleging disability as of March 22, 2007. R. 100, 103. The applications were administratively denied on January 8,

---

[1] The fourth sentence of 42 U.S.C. § 405(g) provides the Court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

1

2008. R. 52, 57. Eckles responded on January 17, 2008, by filing a timely request for an administrative hearing. R. 62. On October 8, 2008, a hearing was held in Seven Fields, Pennsylvania, before Administrative Law Judge James J. Pileggi (the "ALJ"). R. 11. Eckles, who was represented by counsel, appeared and testified at the hearing. R. 14-28, 32-34. Dr. Fred A. Monaco, an impartial vocational expert, also testified at the hearing. R. 28-31. In a decision dated December 23, 2008, the ALJ determined that Eckles was not "disabled" within the meaning of the Act. R. 38-51. The Appeals Council denied Eckles' request for review on May 1, 2009, thereby making the ALJ's decision the final decision of the Commissioner. R. 1.

Eckles commenced this action on June 8, 2009, seeking judicial review of the Commissioner's decision. Doc. Nos. 1 & 4. Eckles and the Commissioner filed motions for summary judgment on September 10, 2009, and October 21, 2009, respectively. Doc. Nos. 9 & 11. These motions are the subject of this memorandum opinion.

### III. STATEMENT OF THE CASE

Eckles was born on February 17, 1971, making her thirty-six years of age as of her alleged onset date and thirty-seven years old as of the date of the ALJ's decision. R. 50. She graduated from high school and completed one year of college. R. 16. She has past relevant work experience as a bartender/waitress, desk clerk and customer service representative. R. 133. Her alleged onset date of March 22, 2007, coincides with the date on which she stopped working. R. 132. She apparently injured herself while attending a funeral on that date. R. 132. At that time, she was employed as a customer service representative for an insurance company. R. 133. After her injury, Eckles reported that she could no longer sit for the period of eight hours that she needed to work in order to complete a shift. R. 132-133.

The record indicates that Eckles experienced significant back pain prior to her injury. On March 1, 2006, Dr. Brian D. Shannon observed that Eckles experienced "pain with palpation through the bottom portion of the sacrum and in the area of the coccyx." R. 189. A magnetic resonance imaging ("MRI") scan of Eckles' pelvis, sacrum and coccyx yielded normal results. R. 189.

Dr. Charles E. D'Auria reported on November 6, 2006, that Eckles had left work that

morning because of pain in the upper and middle portions of her back. R. 217. This pain apparently intensified when Eckles sneezed while pulling into a parking space. R. 217. Dr. D'Auria determined that Eckles had sprained her thoracic spine. R. 217. He cleared her to return to work the next day. R. 217.

Eckles was examined by Dr. D'Auria on March 23, 2007. R. 213. She told him that she had injured her back while attending a funeral the previous day. R. 213. This injury evidently occurred when Eckles got her heel stuck in soft dirt, causing her to strain her back. R. 213. Dr. D'Auria instructed Eckles not to return to work, indicating that she had aggravated her preexisting degenerative disc disease of the lumbar spine. R. 213.

Eckles returned to Dr. D'Auria's office on March 27, 2007, complaining of "severe distress across her back." R. 212. Dr. D'Auria's examination revealed that Eckles' lumbar muscles were "spastic and tender." R. 212. Dr. D'Auria completed paperwork certifying that Eckles was disabled for the short term. R. 212.

Two days later, Eckles was still experiencing "severe pain" in her back. R. 211. An arthrocentesis was performed to alleviate her pain. R. 211. Nevertheless, on April 2, 2007, Eckles went to the Sharon Regional Health System's emergency room because her pain had become more intense. X-rays of her lumbar spine indicated that she had not sustained a fracture. R. 193. When Eckles returned to Dr. D'Auria's office on April 4, 2007, it was noted that she had experienced only a "minimal improvement" of her symptoms after undergoing the arthrocentesis. R. 209.

Eckles was examined by Dr. Robert A. Weiner, a pain management specialist, on April 11, 2007. R. 201-202. Dr. Weiner's examination revealed "tenderness to palpation along [Eckles'] entire vertebral column from the cervical down to the lumbar region." R. 202. Epidural steroid injections were administered to alleviate her back pain. R. 208. Two days later, however, Eckles continued "to have distress across her lumbar area." R. 208. Dr. D'Auria was concerned that Eckles' condition was not improving as rapidly as he had previously expected. R. 208. When Eckles visited Dr. D'Auria on April 19, 2007, it was difficult for her to move on and off of the examination table. R. 207. Nonetheless, she told Dr. D'Auria that the epidural

injections administered by Dr. Weiner had somewhat improved her condition. R. 207. On April 24, 2007, Dr. Weiner performed epidural blocks on Eckles' back. R. 381. As of May 3, 2007, Eckles was feeling "no better and no worse" than she had been feeling in the immediate aftermath of her injury. R. 205.

On May 7, 2007, an MRI scan of Eckles' lumbar spine revealed that there was "a central to left paracentral disc herniation." R. 191. Dr. Weiner performed additional epidural blocks on Eckles' back on May 8, 2007, and May 22, 2007. R. 379-380. Dr. D'Auria decided to refer Eckles to Dr. James Kang for the purpose of determining whether she would need to undergo back surgery. R. 204.

Eckles was examined by Dr. Ravi Ponnappan, who worked under the supervision of Dr. Kang, on June 15, 2007. R. 245-247. She complained of significant problems associated with prolonged sitting and walking. R. 245. It was recommended that she undergo "an L5-S1 left-sided microdiscectomy to address her radicular complaints." R. 246. The procedure was performed by Dr. Kang on June 20, 2007, at the University of Pittsburgh Medical Center's Shadyside Hospital ("UPMC Shadyside"). R. 254-255. An x-ray of Eckles' lumbar spine conducted on July 6, 2007, demonstrated "minimal disc height loss at the L5-S1 level" but "no findings of fracture." R. 253. Dr. Kang examined Eckles that same day. R. 244. In his examination report, he stated as follows:

> **SUBJECTIVE:**
>
> Wendy is 2 weeks status post her left-sided microdiscectomy of L5-S1. She is doing well and her left-sided leg pain for the most part is gone. She is still having some occasional tightness in her hamstrings. She reminded me of her neck symptoms. She has some right-sided arm numbness and tingling, but she does not feel that it is terribly bad.
>
> **OBJECTIVE:**
>
> On exam, her cervical and lumbar range of motion is supple. Her lumbar incision is well healed. Neurologically, motor and sensory examinations of the upper and lower extremities are pretty much normal except for some dullness to pinprick along the S1 dermatome.
>
> **ASSESSMENT/PLAN:**
>
> Wendy is doing well following her microdiscectomy surgery. I have told her to start an aerobic conditioning exercise program. She wanted to travel to Canada,

which I will allow her to do.  I will let her return to work on August 1, 2007.  She also has some neck and radicular symptoms.  She is going to keep an eye on this and if it worsens she will call me to get an MRI.  Otherwise, I will see her back in 3 months for new x-rays of her neck and lower back.

R. 244.  Eckles' condition apparently failed to improve throughout the summer of 2007, however, as Dr. D'Auria found it necessary to refer her for MRI scans of her lumbar, cervical and thoracic spine.  R. 326.

Eckles returned to Dr. Kang's office on August 3, 2007, complaining of continued pain. R. 243.  On that occasion, Dr. Kang observed:

**SUBJECTIVE:**

Wendy is now about 6 weeks post her lumbar discectomy.  She feels that 99% of her left leg pain has resolved but she has generalized aches and pains throughout with a lot of complaints today and she wants me to "fix" her.  She states that her lower back is still bothering her quite a bit when she sits to the point where she cannot imagine going back to her work where she sits and answers phone calls all day long.  In addition to this she has been having neck pain which I have discussed with her in the past and she has chronic neck spasms and some left-sided arm pain.

**OBJECTIVE:**

On exam, her cervical and lumbar range of motion is supple.  Neurologically, motor and sensory examination is pretty much normal.

Radiographic evaluation: I did review MRIs of her cervical, thoracic, and lumbar spine which her primary care physician evidently sent her for.  Her neck shows a small bulging disc at C4-5, but really nothing that is of a substantial nature.  The MRI of the thoracic spine shows a hemangioma at T4, which is benign.  The MRI of the lumbar spine shows the normal postoperative changes at L5-S1.  The large disc herniation is now gone.

**ASSESSMENT/PLAN:**

I have told Wendy that there is really nothing to "fix" at this point, she just has some arthritic mechanical neck and lower back pain.  I have told her to continue with physical therapy and exercises and I could hold her off of work over the short-term in the next month or so and at that point we will reassess and see how things are going.  If she really has no desire to return to her job of course she will have to look for a different type of job which does not demand long periods of sitting and she is looking into this.  Otherwise, I will see her back in a couple of months for new x-rays of her lower back.

R. 243.  On August 6, 2007, Dr. D'Auria reported that there was "no possible way" that Eckles could return to her position as a customer service representative, since she could not sit for the

5

duration of an eight-hour workday. R. 326.

Dr. Kang examined Eckles again on August 27, 2007. R. 324. At that time, Eckles was "still suffering with a lot of mechanical back pain." R. 324. Dr. Kang predicted that Eckles would continue "to have some difficulty in the future." R. 324. He also stated that he would "certainly support" Eckles' attempt to secure Social Security disability benefits. R. 324. On September 4, 2007, Dr. D'Auria treated Eckles for a "severe headache." R. 323. As of October 4, 2007, Eckles was complaining of an inability to sleep due to persistent neck and back pain. R. 322. For the remainder of 2007, Eckles participated in physical therapy sessions at Penn Ohio Rehabilitation ("Penn Ohio"). R. 260-287.

Dr. Michael J. Niemiec, a non-examining medical consultant, reviewed Eckles' medical records in connection with her applications for DIB and SSI benefits. On October 18, 2007, Dr. Niemiec opined that Eckles was capable of performing a range of light work that involved only occasional climbing, balancing, stooping, kneeling, crouching or crawling.[2] R. 288-294. He further predicted that Eckles would "make a satisfactory recovery" before the running of the Act's twelve-month durational period. R. 294.

Eckles saw Dr. D'Auria on November 1, 2007. R. 320. She complained of a "persistent headache" that had lasted for three months. R. 320. Percocet had apparently been ineffective in controlling her headaches. R. 320. Dr. D'Auria observed that there was "no way" that Eckles could return to work. R. 320.

On January 7, 2008, Eckles visited Dr. Heather Porter to undergo a routine gynecological examination. R. 317, 362. Before explaining the results of Eckles' breast and pelvic examinations, Dr. Porter made the following observations:

> She continues to have pain in her neck but she is having worsening pain in her low back. She is having pain in her low back and it radiates down both legs at

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

6

times; it depends on which way she is sitting. If she is leaning more towards the left it radiates down the left side and, if she leans more to the right, it is radiating down the right leg. The pain gets worse with sitting and at times is severe with standing.

R. 317, 362. Dr. Porter opined that Eckles was still unable to work. R. 317, 362. She noted that Eckles would soon undergo an MRI scan of her cervical and lumbar spine. R. 317, 362.

An MRI scan of Eckles' cervical and lumbar spine conducted on January 15, 2008, revealed that she had "degenerative spondylosis throughout the cervical spine" resulting in "varying degrees of canal and foraminal narrowing." R. 382-383, 388-389. After reading the results of the MRI scan, Dr. D'Auria noted that Eckles was suffering from "severe cervical stenosis, lumbar stenosis, spinal stenosis, degenerative disc disease and degenerative joint disease." R. 361. Eckles was unable to continue treatment with Dr. Kang because of a change in her health insurance. R. 317, 362. On January 18, 2008, Eckles was examined by Dr. Gaurav Kapur. R. 310-314. Dr. Kapur did not recommend that Eckles undergo surgery, since she did not have "intractable pain," "cord compression" or "progressive neurological deficits." R. 311.

Eckles informed Dr. D'Auria on March 13, 2008, that she had been working out on a treadmill. R. 358. Nevertheless, she continued to complain of distress in her neck and back. R. 358. She also complained that she was regularly having severe headaches as often as five days per week. R. 358. Dr. D'Auria instructed Eckles to continue taking Percocet. R. 358. During the next few weeks, Eckles experienced nervousness, anxiety and mood swings. R. 357. She was given a prescription for Xanax to control her symptoms. R. 356-357. On April 7, 2008, Dr. D'Auria noted that Eckles was not able to return to her job. R. 356. Two days later, physical therapist Robert A. Murphy reported that Eckles' "functional activities" were limited by back pain. R. 339. Later that month, Eckles received treatment for shingles. R. 354-355.

Eckles was examined by Dr. Robert O. Salcedo, a neurologist, on May 8, 2008. R. 245, 353. She complained of headaches in the back of her head which had been occurring on a daily basis, and which had lasted for several hours at a time. R. 345, 353. Dr. Salcedo indicated that Eckles was suffering from "tension headaches with bilateral occipital neuralgia." R. 345, 353. He administered bilateral occipital nerve block injections to alleviate Eckles' pain. R. 345, 353.

7

He also urged Eckles to stop attending physical therapy sessions, since he believed that they were aggravating her back condition. R. 345, 353. An electroencephalogram conducted on June 13, 2008, yielded normal results. R. 348. On June 19, 2008, Eckles visited Dr. Salcedo for a follow-up neurological examination. R. 347. Dr. Salcedo described the results of that examination as "absolutely normal." R. 347.

Dr. D'Auria examined Eckles on July 7, 2008. R. 346. On that occasion, Eckles reported that her pain medication had lessened her distress and allowed her "to be functional," but that her back was "killing her" in the aftermath of a garage sale. R. 346. Eckles told Dr. D'Auria that she had not engaged in any "lifting or bending" activities in connection with the garage sale. R. 346. Dr. D'Auria prescribed an antibiotic for Eckles, since she was suffering from a cough, congestion, a sore throat and earaches. R. 346.

On August 14, 2008, Dr. D'Auria completed an assessment form describing Eckles' particular functional limitations. R. 363-365. Dr. D'Auria reported that Eckles could not lift or carry ten-pound objects. R. 363. He also indicated that Eckles could stand or walk for "less than" ten minutes, and sit for "less than" one hour, during the course of an eight-hour workday. R. 363-364. He opined that Eckles could only sit for approximately thirty minutes before she would have to change positions, regardless of whether her legs were elevated. R. 364. According to Dr. D'Auria, Eckles could "never" climb, balance, stoop, crouch, kneel or crawl. R. 364. Dr. D'Auria stated that exposure to heights, moving machinery, temperature extremes, chemicals, humidity or vibration would worsen Eckles' pain. R. 365. He deemed Eckles to be incapable of performing even "low stress" jobs at the sedentary level of exertion, since sitting was "intolerable" for her.[3] R. 365. In other words, Dr. D'Auria asserted that Eckles could not sustain gainful employment. R. 365.

---

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

8

Eckles subsequently moved to Shreveport, Louisiana, where she sought treatment from new health care providers. R. 394-406. At the hearing, Eckles testified that, when her "stress level" was up, she would get day-long headaches two to three times per week. R. 18. She stated that she could only stand or walk for about ten to fifteen minutes before she would have to sit down and rest. R. 19. Eckles explained that she could not sit in a chair for more than twenty minutes at a time. R. 19-20. She asserted that she was often unable to change her shoes and socks without assistance. R. 21. Eckles also testified that she typically spent significant amounts of time lying down in order to relieve her pain. R. 24-28.

## IV. STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565,108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of*

9

*Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes

omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. THE ALJ'S DECISION

In his decision, the ALJ determined that Eckles had not engaged in substantial gainful activity subsequent to her alleged onset date. R. 43. Eckles was found to be suffering from degenerative disc disease and headaches, which were deemed to be "severe" impairments within the meaning of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). R. 43. The ALJ concluded that these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). R. 43-44.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Eckles' residual functional capacity as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with a sit/stand option that does not require climbing, balancing, crawling or kneeling, as an integral part of the job. She would not be able to engage in the operation of foot controls and in bending at the waist to 90 degrees. She would not be able to engage in rotation, flexion or extension of the neck to the extremes of range of motion.

11

R. 44.  In light of this assessment, it was determined that Eckles could not return to her past relevant work as a bartender/waitress, desk clerk or customer service representative.  R. 49-50.

Eckles was born on February 17, 1971, making her thirty-six years old as of her alleged onset date and thirty-seven years old as of the date of the ALJ's decision.  R. 50.  She was classified as a "younger person" under the Commissioner's regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).  She had a high school education and an ability to communicate in English.  R. 50; 20 C.F.R. §§ 404.1564, 416.964.  Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Eckles could work as a telephone service employee, document preparer or surveillance system monitor.  R. 50-51.  Dr. Monaco's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  R. 29-30.

## VI.  DISCUSSION

In support of her motion for summary judgment, Eckles argues that the ALJ erred in discounting her subjective complaints, in rejecting Dr. D'Auria's assessment of the limitations caused by her low back impairment, and in relying on vocational expert testimony given by Dr. Monaco in response to a defective hypothetical question.  Doc. No. 10 at 18-26.  The crux of Eckles' argument is that the ALJ's residual functional capacity assessment (and corresponding hypothetical question to Dr. Monaco) did not fully account for all of her credibly established limitations.  Under the precise circumstances of this case, Eckles' argument is persuasive.

In the aftermath of Eckles' injury of March 22, 2007, Dr. D'Auria consistently found her to be incapable of returning to work.  R. 204, 206-213, 320, 323, 326, 356.  A statement by a treating physician indicating that his or her patient is statutorily "disabled" is not entitled to dispositive or controlling weight under the Commissioner's regulations, since the ultimate question of "disability" is reserved for the Commissioner's determination.  *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  In the instant case, however, it is worth noting that the particular job to which Eckles was deemed to be incapable of returning was itself a *sedentary* job.  R. 29.  Dr. D'Auria completed an assessment

12

form specifically describing Eckles' alleged functional limitations. R. 363-365. The critical findings contained in Dr. D'Auria's report were those pertaining to Eckles' alleged inability to stand or walk for more than ten minutes, or sit for more than one hour, during the course of an eight-hour workday. R. 363-364. An inability to sit for extended periods of time, of course, would preclude an individual from engaging in sedentary work activities. 20 C.F.R. §§ 404.1567(b), 416.967(b)(recognizing an "inability to sit for long periods of time" as being inconsistent with an ability to perform sedentary work).

Eckles' inability to sit is well documented in her medical treatment records. As early as April 26, 2007, Dr. D'Auria took notice of Eckles' inability to sit for more than ten minutes without experiencing severe pain. R. 206. Dr. Kang intimated on August 3, 2007, that Eckles needed to find a job which did not require her to sit for extended periods of time. R. 243. On August 17, 2007, a therapist at Penn Ohio reported that "seated postures" would begin to increase Eckles' pain after the passage of only fifteen minutes. R. 283. When Eckles saw Dr. Porter for her annual gynecological examination on January 7, 2008, Dr. Porter observed that Eckles' pain tended to get worse when she was sitting, and that the direction of the pain was dependent upon "which way" she was sitting. R. 317, 362. Hence, Dr. D'Auria's opinion of August 14, 2008, that Eckles could only sit for up to one hour per workday, and for only thirty minutes at a time without interruption, was consistent with the records of Eckles' treatment during the previous sixteen months.

In rejecting Dr. D'Auria's opinion, the ALJ relied on Dr. Kang's treatment notes. R. 46-47. The problem with the ALJ's reasoning, however, is that it did not fully account for all of Dr. Kang's observations. It is true that, as of July 6, 2007, Dr. Kang expected Eckles to be capable of returning to work on August 1, 2007. R. 244. Nevertheless, at that time, Eckles had just undergone surgery a few weeks earlier, and Dr. Kang apparently expected that she would show significant improvement during the remainder of July 2007. When Eckles returned to Dr. Kang's office on August 3, 2007, she was still not able to sit for long periods of time. R. 243. Dr. Kang suggested that she consider finding a job that did not involve "long periods of sitting." R. 243. He agreed to "hold her off of work" for the "next month or so," and to reassess her condition at a

13

later date. R. 243. By August 27, 2007, Dr. Kang was supporting Eckles in her efforts to obtain Social Security disability benefits. R. 249. He noted that she was "still suffering with a lot of mechanical back pain," and he predicted that she would "have some difficulty in the future as well." R. 249.

The ALJ also relied on Dr. Niemiec's consultative opinion in deciding to reject Dr. D'Auria's assessment. R. 48-49. The ALJ's reliance on Dr. Niemiec's opinion was problematic for two reasons. First of all, the United States Court of Appeals for the Third Circuit has consistently held that a consultative report supplied by a non-treating, non-examining physician ordinarily does not constitute "substantial evidence" of a claimant's ability to work when it is contradicted by a well-supported report provided by a treating physician. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008); *Dorf v. Bowen*, 794 F.2d 896, 901-902 (3d Cir. 1986); *Brewster v. Heckler*, 786 F.2d 581, 585-586 (3d Cir. 1986). Second, in this case, Dr. Niemiec's report, when considered in light of the entire evidentiary record, did not support the ALJ's conclusion in any event. Dr. Niemiec's assessment of October 18, 2007, was based on a *prediction* that Eckles would be able to perform a limited range of light work by March 22, 2008. R. 294. It was not based on a belief that Eckles was capable of working as of October 18, 2007. R. 294.

The Act defines the term "disability" as an "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also *Barnhart v. Walton*, 535 U.S. 212, 217-23 (2002) (upholding Administration's interpretation of "disability" at 20 C.F.R. § 404.1520(b) as lawful construction of statute).[4] In order for a claimant to qualify as "disabled," *both* his or her "medically determinable physical or mental impairment" *and* his or her "inability to engage in substantial gainful activity" must last (or be expected to last) for the statutory

---

[4]Although the statutory definition applicable to SSI claims brought under Title XVI is not identical to the statutory definition applicable to DIB claims brought under Title II, there is no material difference between the two definitions. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

twelve-month period. *Barnhart*, 535 U.S. at 214-222. Dr. Niemiec evidently believed that Eckles' existing "inability to engage in substantial gainful activity" would not last long enough to satisfy the Act's twelve-month durational requirement. R. 294. Even if Dr. Niemiec's prediction initially provided a sufficient basis for the denial of Eckles' applications when it was made, it provided no basis whatsoever for the ALJ's subsequent denial of those applications on December 23, 2008, several months *after* the running of the one-year period, in the absence of any evidence that Eckles' condition actually had improved.

Attempting to discredit Dr. D'Auria's assessment of Eckles' work-related capabilities, the ALJ referenced a treatment note authored by Dr. D'Auria on July 7, 2008. This treatment note stated as follows:

> She has a history of fibromyalgia and she is in today for recheck of that. She complains of a little cough, congestion, sore throat and earaches. She is planning on moving to Louisiana in the near future. She notes that the pain medication does lessen her distress and allows her to be functional. She notes that she had a garage sale this weekend and her back is killing her. She notes that she did no lifting or bending.

R. 346. The ALJ apparently viewed this treatment note as being in conflict with Dr. D'Auria's opinion of August 14, 2008. R. 49. To the contrary, the report that Eckles' back was "killing her" in the aftermath of a garage sale was actually *consistent* with Dr. D'Auria's subsequent assessment. Although it is not entirely clear what Dr. D'Auria meant when he said that Eckles' pain medication was allowing her "to be functional," it is clear from a review of his treatment records as a whole that he was not referring to an ability to engage in work-related activities on a sustained basis.

Of course, "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). A claimant's ability to engage in sporadic activities of daily living cannot be equated with an ability to perform the duties of a full-time job. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). The fact that Eckles was able to participate in a garage sale on one day did not significantly undermine her case, and the exacerbation of her back pain resulting from her participation in the garage sale could reasonably be viewed as a factor weighing in her favor.

15

For the foregoing reasons, the ALJ's finding that Eckles was capable of engaging in a limited range of sedentary work is not "supported by substantial evidence." 42 U.S.C. § 405(g). Consequently, the Commissioner has not satisfied his burden of establishing the existence of jobs consistent with Eckles' residual functional capacity.[5] The only remaining question is whether Eckles is entitled to an immediate award of benefits, or whether a remand for further proceedings is the appropriate remedy.

A judicially-ordered award of benefits is proper only where the record has been fully developed and the substantial evidence as a whole indicates the claimant is disabled. *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000); *Podedworny v. Harris*, 745 F.2d 210, 221-22. That standard is met here. Although Dr. Niemiec *predicted* on October 18, 2007, that Eckles would "make a satisfactory recovery" before the running of the Act's twelve-month durational period, there is no evidence that Eckles actually experienced such a recovery. As noted earlier, Dr. D'Auria's opinion of August 14, 2008, which was consistent with the observations made by Eckles' other treating physicians during the previous sixteen months, demonstrated that Eckles' inability to sit for any length of time (and consequent inability to perform sedentary work) had already lasted long enough to satisfy the Act's durational requirement. Eckles has established her

---

[5]At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). In order for a vocational expert's answer to a hypothetical question to constitute competent evidence of the existence of jobs consistent with a claimant's residual functional capacity, the administrative law judge's hypothetical question must adequately convey to the vocational expert *all* of the claimant's credibly established limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). If a credibly established limitation is not included within the hypothetical question, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Burns v. Barnhart*, 312 F.3d 113, 122-124 (3d Cir. 2002). In this case, the ALJ's residual functional capacity finding is not "supported by substantial evidence." 42 U.S.C. § 405(g). Since the ALJ's hypothetical question to Dr. Monaco was based on a deficient assessment of the evidence, Dr. Monaco's answer to that question did not constitute competent evidence of the existence of jobs consistent with Eckles' residual functional capacity. R. 29-30.

entitlement to benefits for the period of time at issue, and no subsequent or future improvement in her condition can change the fact that she was unable to work for more than a year. By the later part of August 2007, all of the treating physicians recognized that Eckles impairments were producing limitations that precluded substantial gainful activity none opined or expressed the view that a recovery on that level was immanent or even close at hand. While the Commissioner remains free to further evaluate and/or monitor Eckles' condition in accordance with his regulations and the provisions of the Act for the purpose of determining her continued eligibility for benefits, he is not free to deny her the benefits for the period of disability that has been conclusively established on the record.

## VII. CONCLUSION

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or can be expected to last for a continuous period of at least twelve months. The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week. *Dobrowolsky v. Califano*, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis. Plaintiff had the burden of making out a prima facia case that she was disabled within in the meaning of the Act. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a). This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity. *Rossi v. Califano*, 602 F.2d 55 (3d Cir. 1979). Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity at least as of August 27, 2007, when Dr. Kang indicated that the limitations from Eckles' impairments caused her significant pain, would continue to do so into the future and supported Eckles' application for benefits. At that juncture

all of the treating sources had formed the opinion that the limitations from Eckles' low back impairment prevented her from meeting the demands of substantial gainful activity on a regular and sustained basis. There was no substantial evidence to the contrary over the remaining several months under review. Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled at or after that point in time they were not supported by substantial evidence. As a result, Plaintiff's motion for summary judgment must be granted in part and the matter will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of August 27, 2007, and such further evaluation, review or undertakings deemed appropriate in determining the duration of Eckles' entitlement to benefits.

An appropriate order will follow.

Date: August 25, 2010

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc: Robert G. Yeatts, Esquire
Lewis & Ristvey
689 North Hermitage Road
P. O. Box 1024
Hermitage, PA 16148

Lee Karl, AUSA
United States Attorney's Office
Suite 4000
U.S. Post Office and Courthouse
700 Grant Street
Pittsburgh, PA 15219